# DECISIONS

OF THE

## SUPREME JUDICIAL COURT

OF

## MASSACHUSETTS

St. Botolph Citizens Committee, Inc., & others[1] *vs.*
Boston Redevelopment Authority & others.[2]

Suffolk. December 11, 1998. - February 12, 1999.

Present: Wilkins, C.J., Abrams, Lynch, Greaney, Fried, Marshall, & Ireland, JJ.

*Urban Renewal. Zoning,* Appeal, Person aggrieved, Building permit. *Practice,*
*Civil,* Relief in the nature of certiorari. *Municipal Corporations,* Planning
board. *Eminent Domain,* Authority for taking.

Description of the comprehensive review process for proposed large-scale
development projects in Boston set forth in art. 31 of the Boston Zoning
Code, as applicable before being superseded in 1996 by art. 80 of the
code. [3-4, 5, 6-7]

[1]Mary Soohoo, Nancy Restuccia, Joseph Restuccia, James Tattersall, Eric
Rice, and Sidney L. Sherter.

[2]The city of Boston; The Druker Company, Ltd.; and Mercury Huntington
Corp., as trustee of the Colonnade Trust.

Where the Boston Redevelopment Authority acted exclusively in its capacity as the planning board for the city of Boston in making a preliminary adequacy determination under the then applicable art. 31 of the Boston Zoning Code for a large-scale development project, its decision was not reviewable by an action in the nature of certiorari, inasmuch as art. 31 contemplates a comprehensive review and approval process culminating in the inspectional services' commissioner's issuance or denial of a building permit, from which final action aggrieved parties are provided an explicit right of review and appeal under §§ 8 and 11 of the Boston Zoning Code, St. 1956, c. 665. [8-10]

Plaintiffs who opposed an urban renewal development project were without standing to maintain an action against the Boston Redevelopment Authority (BRA) for its decisions initiating, planning, and implementing the project, solely in its capacity as an urban renewal agency under the provisions of G. L. c. 121B, where that statute provides no appeal from the BRA's decisions thereunder. [10-12]

An action in the nature of certiorari or seeking a declaration of rights is not available to review the essentially legislative decisions of the Boston Redevelopment Authority, acting as an urban renewal agency pursuant to G. L. c. 121B. [12-13]

The Uniform Procurement Act, G. L. c. 30B, has no applicability to takings properly made by the Boston Redevelopment Authority under G. L. c. 79. [13]

CIVIL ACTIONS commenced in the Superior Court Department on October 15, 1996.

Motions to dismiss were heard by *Barbara J. Rouse*, J., and the cases were reported by her. The Supreme Judicial Court transferred the case from the Appeals Court on its own initiative.

*Saul A. Schapiro* (*Nina F. Lempert* with him) for Boston Redevelopment Authority.

*Robert J. Muldoon, Jr.* (*Mary Ellen McDonough* with him) for The Druker Company, Ltd., & another.

*Kabrina Krebel* for the city of Boston.

*Howard P. Speicher* (*Ann Sobolewski* with him) for the plaintiffs.

GREANEY, J. We transferred these consolidated appeals to this court on our own motion to decide whether the plaintiffs can maintain their challenges to a decision made by the Boston Redevelopment Authority (BRA) concerning the development of new residential units in the Fenway Urban Renewal Area. The plaintiffs sought to set aside the BRA's decision in a six-count complaint seeking review in the nature of certiorari and

declaratory judgments. The defendants filed motions to dismiss. A judge in the Superior Court reported, without decision, the question whether the plaintiffs had the right to obtain immediate review, by certiorari, of the BRA's adequacy determination under Count I of their complaint. See Mass. R. Civ. P. 64, as amended, 423 Mass. 1410 (1996). The judge dismissed Counts II through V of the complaint without prejudice, and she reported the correctness of her decision on these claims.[3] The judge dismissed Count VI of the plaintiffs' complaint with prejudice. We conclude that Count I should be dismissed because the plaintiffs have a remedy under the Boston Zoning Code, and that Counts II through VI should be dismissed with prejudice.

The following is the background necessary in order to understand the issues. The BRA is an urban renewal agency and a redevelopment authority that supervises the adoption and administration of urban renewal plans in Boston. See former G. L. c. 121, § 26QQ, as amended through St. 1957, c. 150, § 1 (the predecessor statute to G. L. c. 121B); G. L. 121B, §§ 4, 9, 46-50. The BRA also serves as the planning board for Boston. See St. 1960, c. 652, § 12. The plaintiffs challenge determinations of the BRA under each of these functions.

General Laws 121B provides a comprehensive scheme for the approval and administration of urban renewal plans.[4] Urban renewal agencies are granted broad powers under G. L. c. 121B, including the power of eminent domain, and urban renewal plans may include public or privately sponsored property construction and development, subject to the authority of both the urban renewal agency and local zoning bylaws. The plans are generally expected to take many years to complete, and, in

---

[3]The judge dismissed Counts II through V without prejudice because she concluded that the plaintiffs had not shown her how they would be directly injured by the project approved by the Boston Redevelopment Authority (BRA). It appears that the plaintiffs could cure the defect relied on by the judge and thus file Counts II through V again. For the reasons explained in Part 2 of this opinion, we conclude that these counts should be dismissed with prejudice on grounds other than the ground relied on by the judge.

[4]Urban renewal plans adopted by the BRA must be approved by the Boston city council, the mayor of Boston, and the State Department of Housing and Community Development. See G. L. c. 121B, §§ 1, 48. Once an urban renewal plan is approved, it also has to be approved by the United States Department of Housing and Urban Development. See 42 U.S.C. §§ 1455(a), 1456(h) (1994).

part because of this long project life, urban renewal plans have provisions which provide for modification of the plans after their initial approval to address changes in economic realities and urban conditions.

The Fenway Urban Renewal Plan received final Federal approval in 1967. The plan covers a large area of Boston, extending from the Riverway, on its western boundary, to the Hynes Convention Center, on its eastern boundary, and includes the entire Back Bay Fens and the Longwood Medical area. The plan provides for a forty-year period of urban renewal projects, and states as its goals the stimulation of public, private, and institutional actions to upgrade the area physically and economically; the improvement of public facilities in the area; the renewal and revitalization of residential areas; and the stimulation of rehabilitation by private action. In order to achieve these goals, the plan proposes, in part, that the BRA acquire and either clear or sell for rehabilitation a number of parcels in the area. The plan then designates twenty-three parcels for disposition and redevelopment. Under the terms of the plan, if a developer purchases a property from the BRA for redevelopment, the developer must abide by the planning and design requirements and maximum floor area ratios specified in the plan by the BRA.

One of the twenty-three parcels, designated by the BRA as Disposition Parcel 2, contains the site which is the subject of this litigation. Already on this parcel is the Colonnade Hotel, at 118-120 Huntington Avenue, a twelve-story, first-class hotel which, together with its garage, occupies an entire city block. The owner of the parcel, the defendant Mercury Huntington Corp., trustee of the Colonnade Trust (trustee), and the defendant The Druker Company, Ltd., the developer (developer), seek to construct a residential apartment building on the parcel which will be known as the Colonnade Residences (Residences). In order to do so, the developer, on behalf of the trustee, submitted a project notification form to the BRA seeking review and approval, as required by the plan, of the Residences. The developer requested that the BRA modify the Fenway Urban Renewal Plan by eliminating the maximum floor area ratio requirement previously designated for this site,[5] and that it authorize an order of taking, exercising the BRA's eminent

---

[5]Floor area ratio is the ratio of floor area to the total area of the lot, and refers to the amount of space which may be built in relation to land area. As

domain powers, to acquire some small parcels (Sliver Parcels) owned by the city for conveyance to the developer[6] for inclusion in the project.

Article 31 of the Boston Zoning Code[7] applies to the development of any new building, within a designated area of Boston, having a gross floor area of 50,000 or more square feet. See Boston Zoning Code, art. 31, § 31-4. This includes any buildings meeting these specifications in the Fenway Urban Renewal Area. The stated purposes of art. 31 are to "institute a process for the review of large-scale development projects"; to provide an opportunity for public review and comment; to meet transportation, parking, health and safety, economic, aesthetic, and environmental goals; to "ensure compliance with the intent and purpose of [the Boston Zoning Code]; and to promote efficiency in the administration of [the] Code." Article 31, § 31-1. Under art. 31, the BRA, in its role as the planning board of Boston, oversees a "Development Review Procedure" for all qualifying development projects and must issue an "Adequacy Determination" before any project may move forward. Article 31, § 31-5.

After public comment periods, an open public meeting, and consultation with other city and State agencies, the BRA voted, with respect to the Residences, to authorize the issuance of an adequacy determination under art. 31, to approve modifications to the Fenway Urban Renewal Plan, and to issue an order of taking of the Sliver Parcels through its eminent domain powers under G. L. c. 121B, § 11 (*d*). Following these determinations, the St. Botolph Citizens Committee, Inc. (a neighborhood as-

---

the floor area ratio increases, the density of land use increases. The Fenway Urban Renewal Plan set maximum floor area ratios for each designation parcel. The maximum floor area ratio permitted for the parcel was 5.5. The developer requested the BRA to modify the plan to eliminate that requirement, and to make a project's proposed floor area ratio subject only to the approval of the BRA.

[6]Approximately 750 square feet of land, located adjacent to the project site, was owned by the city in connection with earlier takings for street improvements to Huntington Avenue. The developer proposed to build part of the apartment complex over this land, which consists of "sliver-shaped" parcels.

[7]Boston's zoning regulations are set forth in the Boston Zoning Code and the Boston Zoning Act, St. 1956, c. 665, as amended through St. 1993, c. 461, under which the Zoning Code was adopted and is amended.

In 1996, art. 31 was superseded by a new zoning provision, art. 80, entitled "Development Review and Approval." Since art. 31 was in effect at the time of the BRA decisions in question, that provision governs this case.

sociation of property owners and residents), and the individual plaintiffs filed their six-count complaint in the Superior Court against the BRA, the developer, and the trustee. Counts I, II, and III of the complaint sought review through certiorari. The plaintiffs claimed that the issuance of the adequacy determination had been an abuse of the BRA's discretion, exceeded its authority, was not based on substantial evidence, was based on an error of law and was arbitrary and capricious (Count I). The plaintiffs claimed that the procedure used by the BRA to modify the Fenway Urban Renewal Plan was erroneous (Count II), and they challenged the BRA's implicit determination that the Residences should be part of the urban renewal plan (Count III). The plaintiffs also sought declaratory judgments that the designation of the property as an urban renewal area was arbitrary and capricious (Count IV), that the change in the floor area ratio allowed by the BRA violated applicable uniformity requirements (Count V), and that the taking of the Sliver Parcels was in excess of the BRA's authority (Count VI).

The defendants filed motions to dismiss, alleging, among other grounds, that the plaintiffs lacked standing to maintain their claims. A judge in the Superior Court then acted on the defendants' motions in the manner previously described, which brings before us the question whether the plaintiffs can maintain any of their claims.

1. *Count I.* We conclude that the plaintiffs' claim under Count I, challenging the adequacy determination made by the BRA under art. 31 of the Boston Zoning Code, should be dismissed.

Article 31 of the Boston Zoning Code, entitled "Development Review Requirements," sets forth a comprehensive process for review, at the preschematic design phase, of large-scale development projects in Boston.[8] The process includes consultation by the BRA with a number of city and State agencies, publication of design plans, and public comment periods. In response to information concerning a proposed project's effects on transportation, environmental protection, urban design,

---

[8]Article 31's development review procedure consists of the following stages: (1) project notification form, (2) scoping determination, (3) draft project impact report, (4) preliminary adequacy determination, (5) final project impact report, and (6) adequacy determination. The development review process requires the BRA to address the proposed development's impact on five different areas of concern: transportation, environmental protection, architectural design, historic resources, and infrastructure systems.

historic resources, and infrastructure systems, the BRA orders the developer to prepare and submit mitigation plans for any identified impacts. After the developer complies with these requirements, there is an additional public comment period, after which the BRA votes whether to issue an adequacy determination. If the adequacy determination is issued, the developer must agree to abide by its terms before proceeding further with a project's development.

After completing the art. 31 review process, a developer must complete final plans for the proposed project (the art. 31 process takes place with only schematics) and submit them to the commissioner of inspectional services (commissioner) with the building permit application. That office then forwards the final plans to the BRA. If the BRA certifies that the developer has satisfied the relevant provisions of the Boston Zoning Code for which it must ensure compliance, including art. 31, the commissioner conducts a final review of the project for compliance with the Boston Zoning Code as a whole and with the Building Code. The commissioner issues or declines to issue a building permit. See Boston Zoning Act, St. 1956, c. 665, § 7.

If a developer receives an adequacy determination from the BRA, there are several more steps to complete before a building permit can be applied for and issued. Neither art. 31 nor the Boston Zoning Act, St. 1956, c. 665, provides an explicit right to, or avenue of, appeal by an applicant from adverse decisions by the BRA under art. 31, nor do they provide a right of appeal by other parties who assert that they are aggrieved by the adequacy determination and seek to challenge it.

Because there is no explicit right of appeal from the issuance of an adequacy determination by the BRA, the plaintiffs assert that they have a right to contest the determination by certiorari as soon as it is made. Certiorari is a limited procedure which may be used to correct substantial errors of law committed by a judicial or quasi-judicial tribunal (but not administrative, political, or legislative decisions). See *Warren* v. *Hazardous Waste Facility Site Safety Council*, 392 Mass. 107, 117 (1984), citing *Boston Edison Co.* v. *Selectmen of Concord*, 355 Mass. 79, 83 (1968). Certiorari cannot be requested where administrative remedies terminating in judicial review are available and unexhausted. See *Carney* v. *Springfield*, 403 Mass. 604, 605 (1988), citing *Reidy* v. *Acting Director of Civil Serv.*, 359 Mass. 760 (1968); *Quincy* v. *Planning Bd. of Tewksbury*, 39 Mass. App.

Ct. 17, 20 (1995), and cases cited. The plaintiffs refer to cases where review by certiorari has been allowed to consider an adverse local wetlands decision by a local conservation commission, see *Lovequist* v. *Conservation Comm'n of Dennis*, 379 Mass. 7, 8-9 (1979), and a decision by a planning board that subdivision approval was not required, see *Stefanick* v. *Planning Bd. of Uxbridge*, 39 Mass. App. Ct. 418, 424-425 (1995). The plaintiffs argue that the BRA's art. 31 determination is analogous to the decisions at issue in these cases and should be reviewed now by certiorari. The BRA asserts that its art. 31 determination is essentially legislative in nature, and therefore is not subject to review under the reasoning of cases such as *Cummings* v. *Secretary of the Executive Office of Envtl. Affairs*, 402 Mass. 611 (1988), where a decision by the defendant not to require an environmental impact report was held to be unreviewable, and *Warren* v. *Hazardous Waste Facility Site Safety Council, supra*, where a similar result was reached with respect to a feasibility determination by the defendant as to the location of a hazardous waste site.

The cases relied on by the parties are not helpful to a resolution of the issue. We need not enter the general debate over whether the BRA's issuance of the adequacy determination was the discharge of an adjudicatory or legislative function because we conclude that the answer to the question is more direct and simple. The answer requires us to take note of the BRA's role in making a determination under art. 31, and to examine the nature of that determination.

In deciding whether an adequacy determination should issue, the BRA is acting exclusively in its capacity as the planning board for Boston. The art. 31 determination itself requires that the BRA, in its capacity as a planning board, examine a proposed project with reference to a specified set of criteria to measure the project's impact on the city and the area where it is to be located, and, if the project is to go forward, to shape it in a way that will eliminate or mitigate any adverse consequences. In performing these tasks, the BRA acts in a manner similar to that conducted by a municipal planning board when it performs site plan review.[9] Site plan review also occurs with respect to preliminary plans submitted by a developer, and the review

[9]Because site plan review is created by local ordinance or bylaw and not State statute, we recognize that the term does not have one meaning nor is the review process uniform from municipality to municipality. Here, we refer to a

requires the municipal planning board to assess the project's impact on the city or town (and the area where it will be located) with respect to a variety of issues. The local planning board then acts, where appropriate, to impose "for the public protection . . . reasonable terms and conditions" on the anticipated project. *Y.D. Dugout, Inc.* v. *Board of Appeals of Canton*, 357 Mass. 25, 31 (1970). See M. Bobrowski, Massachusetts Land Use and Planning Law § 9.7, at 361-362 (1993 & Supp. 1996) ("Site plan review establishes criteria for the layout, scale, appearance, safety, and environmental impacts of commercial or industrial development in an attempt to 'fit' larger projects into the community"). An approval after site plan review, when required in connection with the issuance of a building permit, is not a final action, but only a prerequisite to the grant of the permit. The Appeals Court has said, we think correctly, that the right of an aggrieved person to appeal a local planning board's site plan review decision arises only when the building permit for the proposed project is issued or denied by the building inspector. See *Quincy* v. *Planning Bd. of Tewksbury*, *supra* at 20-22; *McDonald's Corp.* v. *Seekonk*, 12 Mass. App. Ct. 351, 353 (1981).

The comparability between the BRA's issuance of an adequacy determination under art. 31, in its planning board capacity, and a local planning board's decision to approve a site plan as discussed above, leads directly to an examination of the Boston Zoning Code to see what rights are given to an aggrieved person in connection with the approval or denial of an application of a building permit. That examination discloses that the plaintiffs, assuming that they are aggrieved persons, may make a request to the commissioner to deny the developer's application for a permit for the Residences, or challenge the issuance of the permit before the Boston zoning board of appeal.[10] These remedies, as relevant to this case, are set forth in §§ 8 and 11 of the Boston Zoning Act, St. 1956, c. 665, where the Act provides, in § 8, that "persons aggrieved" may challenge the issuance of a building permit or the failure or refusal of the

---

site plan review process that does not result in the issuance or denial of a special permit, but a process that is a mandatory precedent to application for a building permit.

[10] A formal request to the commissioner to deny the application for a building permit by a person aggrieved is not a prerequisite to an appeal to the Boston zoning board. We point out the option because it is obviously available to an aggrieved person before resort is made to more formal proceedings.

commissioner to enforce the Zoning Act or the Building Code, and, in § 11, that such persons may appeal from the board's decision to the Superior Court in Suffolk County on compliance with such conditions set forth therein as may be applicable. See *Damaskos* v. *Board of Appeal of Boston*, 359 Mass. 55, 63-64 (1971); *Bonan* v. *Board of Appeal of Boston*, 21 Mass. App. Ct. 678, 682-683 (1986).

The existence of this method of review furthers the common-sense application of art. 31, by ensuring that an otherwise feasible project which receives an adequacy determination from the BRA will not be delayed by possibly lengthy legal proceedings when the project is still at a preliminary stage in the extensive process that must be completed before a G. L. c. 121B urban renewal project can be approved in Boston. The building permit stage is one of finality, and, if an appropriate challenge is made to the issuance of a permit, the Boston zoning board can look at a project like the Residences after the project has passed every step required by the various authorities that have a right to examine it. At this juncture, the Boston zoning board can focus on specific complaints by persons aggrieved with an eye toward resolving them expeditiously under standards that recognize the discretionary authority vested in the BRA, in its capacity as a planning board, with respect to projects under a redevelopment plan, see generally *Prudential Ins. Co.* v. *Board of Appeals of Westwood*, 23 Mass. App. Ct. 278, 282-284 (1986), and the commissioner's responsibility to decide whether applicable requirements of the Boston Zoning Code and the Boston Building Code have been satisfied consistent with the deference granted the BRA in considering an adequacy determination. It follows from what has been said that the plaintiffs' effort in Count I of their complaint to seek immediate judicial review by certiorari of the BRA's issuance of the adequacy determination for the Residences cannot be maintained. Count I will be dismissed because the plaintiffs, if they are persons aggrieved, have the remedy described above.

2. *Counts II through V.* Counts II through V should be dismissed because the plaintiffs lack standing to maintain them. These counts pertain to decisions of the BRA solely in its capacity as an urban renewal agency under G. L. c. 121B. The plaintiffs argue that the BRA improperly modified the Fenway Urban Renewal Plan and failed to comply, in various ways, with its obligations under the plan. General Laws c. 121B

provides no explicit right of appeal to persons allegedly aggrieved by decisions made by the BRA, in its capacity as an urban renewal agency, like the decisions made by the BRA in connection with the Residences.[11] The plaintiffs point to St. 1960, c. 652, § 13, which grants a right of appeal by way of an action in the nature of certiorari to persons aggrieved by a decision made by the BRA under G. L. c. 121A, in connection with urban redevelopment corporations. They argue that a similar right of appeal by way of an action in the nature of certiorari should be granted to persons aggrieved by BRA decisions under G. L. c. 121B to give them an explicit right of appeal in this case.

General Laws c. 121A and c. 121B have similar goals, but the methods by which the goals are achieved are fundamentally different. Under G. L. c. 121B, BRA projects are publicly initiated and planned, and implemented in conformance with an urban renewal plan. The plan is initiated by the BRA and must be approved by the Boston city council and mayor, and independent State and Federal agencies. After securing approval, the BRA may then undertake the project by acquiring, clearing, and redeveloping the parcels involved and by initiating other urban renewal activity. See G. L. c. 121B, §§ 46-48. By comparison, under G. L. c. 121A, urban redevelopment corporations, even though approved by the BRA, are privately initiated and privately owned throughout their existence. The procedures for public approval are considerably less stringent than for projects under c. 121B, and there is less public participation throughout the process. See *Boston Edison Co.* v. *Boston Redevelopment Auth.*, 374 Mass. 37, 50-53 (1977). In order to provide a remedy for parties affected by G. L. c. 121A projects in Boston, the Legislature provided in G. L. c. 121A, by St. 1960, c. 652, § 13, a right of appeal for "any person . . . aggrieved." The Legislature has not enacted a parallel right of appeal for decisions made by the BRA under G. L. c. 121B. The legislative choice is an intentional one. There is no basis to graft a right of appeal from St. 1960, c. 652, onto G. L. c. 121B, which purposely creates no right of appeal from BRA decisions in its capacity as an urban renewal agency.

The plaintiffs also argue that we have previously granted the

---

[11]General Laws c. 121B provides a right of appeal in § 47 to aggrieved persons when an urban renewal agency has taken, or proposes to take, their land by eminent domain. This provision has no application to the plaintiffs.

right of appeal to aggrieved persons under G. L. c. 121B, even in the absence of an express right of appeal in that statute. They rely on our decision in *Benevolent & Protective Order of Elks, Lodge No. 65* v. *Planning Bd. of Lawrence*, 403 Mass. 531 (1988) (*Elks Lodge*), and assert that the circumstances in that case are similar to this case. That decision, however, applies in a limited circumstance, namely, when an urban renewal agency seeks to acquire land after the supervising State agency (then the Executive Office of Communities and Development [EOCD]) has approved the urban renewal plan. In the *Elks Lodge* case, the plaintiffs were owners of land which was to be taken by eminent domain for the urban renewal project. We concluded that, while G. L. c. 121B did not expressly grant a right to appeal from the action taken by the EOCD under that statute, judicial review was nevertheless proper because the plaintiffs were questioning the public purpose for which their land was being taken, and claiming a violation of their constitutional rights.[12] See *Elks Lodge, supra* at 536, and cases cited. Providing a safeguard to persons whose land is to be taken by eminent domain, to ensure that there is a valid constitutional basis for a taking, is fundamentally different from the right of appeal the plaintiffs seek. In Counts II through V, the plaintiffs are not challenging a taking. They also are not claiming a violation of any constitutional right. Instead, they are disputing modifications to the Fenway Urban Renewal Plan, and the plan's implementation by the BRA to include the Residences. The circumstances are different here, and the reasoning in the *Elks Lodge* decision has no application.

The plaintiffs argue finally that they are entitled to review by certiorari or through a declaration of rights. The decisions made by the BRA under G. L. c. 121B are legislative in nature. They involve policy matters concerning the implementation of long-term development of areas of Boston considered to be in need of renewal. For this reason, G. L. c. 121B provides no explicit right of appeal in connection with the BRA's management of an urban renewal plan. As a result, the plaintiffs have no right to

---

[12]A prerequisite for any taking is the constitutional requirement that the taking be made for a public purpose. See *Benevolent & Protective Order of Elks, Lodge No. 65* v. *Planning Bd. of Lawrence*, 403 Mass. 531, 539 (1988), and cases cited. Under G. L. c. 121B, § 48, a taking is valid if the EOCD makes a preliminary finding that an area is "blighted," and thus "detrimental to the safety, health, morals, welfare or sound growth of a community." G. L. c. 121B, § 1.

seek relief for the matters complained of in Counts II through V of their complaint.

3. *Count VI.* Count VI should be dismissed with prejudice because the takings questioned by that count are proper under G. L. c. 79. The plaintiffs' argument that the Uniform Procurement Act, G. L. c. 30B, has application to the takings lacks merit because that statute expressly excludes contracts to "acquire residential, institutional, industrial or commercial real property by . . . [an] urban renewal agency engaged in the development and disposition of said real property in accordance with a plan approved by the appropriate authorizing authority." G. L. c. 30B, § 1 (*b*) (25). Because the BRA is an urban renewal agency as described in § 1 (*b*) (25), and because the BRA intends to acquire the Sliver Parcels in accordance with the approved Fenway Urban Renewal Plan, G. L. c. 30B has no relevance. The plaintiffs' arguments to the contrary cannot be justified on any rational reading of G. L. c. 30B.

4. A judgment is to be entered dismissing Count I of the plaintiffs' complaint, and dismissing Counts II through VI of their complaint with prejudice.

*So ordered.*